On August 13, 1991, the Department of Children and Youth Services (DCYS) filed a petition to terminate the parental rights of Lori T. (Lori) and Jonathan T. Sr. (Jonathan Sr.), the biological parents of this child, alleging all four grounds pursuant to Section 17a-112 of the Connecticut General Statutes (C.G.S.) as follows:
 1. The child has been abandoned by the respondents in the sense that the respondents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
 2. The respondents were found in a prior proceeding to have neglected the child and have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the respondents could assume a responsible position in the life of the child.
 3. The child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights.
 4. There is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of the respondents having met on a day-to-day basis, the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interests of the child.
The petitioner must prove et least one of the four grounds by clear and convincing evidence, which has existed for at least one year, unless waived by the court under Section 17a-112(c) C.G.S. It must also prove, by clear and convincing evidence that termination of parental rights is in the best interest of the child.
By statutory definition, termination of parental rights means "the complete severance by court order of the legal relationship, with all rights and responsibilities, between the child and his parent or parents so that the child is free for adoption . . . ." Section 17a-93(e) of the Connecticut General Statutes. It is a most serious and sensitive judicial action. In re Juvenile Appeal (Anonymous),181 Conn. 638, 436 A.2d 290 (1980). "Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents CT Page 5568 in their children `undeniably warrants deference and, absent a powerful countervailing interest, protection.'" In re Juvenile appeal (Anonymous), 177 Conn. 648, 671, 420 A.2d 875 (1979). The standard of proof in an action to terminate parental rights is clear and convincing evidence, or as sometimes stated, clear and positive proof. Section 17a-112(b) of the Connecticut General Statutes. In re Juvenile Appeal, 194 Conn. 252, 255; In re Theresa S., 196 Conn. 18, 24, n. 5; In re Juvenile Appeal (83BC),189 Conn. 66, 72; In re Juvenile Appeal (84-6), 2 Conn. App. 705,708, cert. denied, 195 Conn. 801.
See also Santosky v. Kramer, 455 U.S. 745, 747-48. Section 1049 of the Connecticut Practice Book states: "The allegations of an application to terminate parental rights shall be proved by clear and convincing evidence." Clear and convincing evidence had been described as a level of proof that lies between the usual civil requirement of a fair preponderance of the evidence and the criminal standard of beyond a reasonable doubt. Cookson v. Cookson, 201 Conn. 229, 234. Proof by clear and convincing evidence means proof of a quality that is sufficient to convince the court beyond an average certainty that the respondents' rights as a parent should be ended. In re Juvenile Appeal (84-3), 1 Conn. App. 463,468. The petitioner is required to prove only one of the grounds alleged by clear and convincing evidence in order to prevail on the petition. In re Juvenile Appeal (84-3), supra, 463, cert. denied, 193 Conn. 802.
A petition for the termination of parental rights consists of two phases, the adjudicatory phase and the dispositional phase. Connecticut Practice Book, Section 1042, 1044, 1059. There is no requirement that the adjudicatory phase and the dispositional phase should be held in different hearings; rather, a unified hearing is permissible. In re Juvenile Appeal (84-AB), 192 Conn. 254,259 (1984). There is a different purpose for each of the two phases. In the adjudicatory phase, the court receives evidence to determine the validity of the allegations made in the petition, and the court is limited in receiving evidence to the events that occurred prior to the filing of the petition. The dispositional phase only takes place after one of the grounds or causes for termination is established. Then the court must consider the best interests of the child and is permitted to consider facts and events that occur after filing of the petition to the time of trial.
During the initial hearing on September 3, 1991, petitioner requested an updated psychological evaluation on respondent-parents and Jonathan and a parent-child interaction evaluation. The evaluations were court-ordered on that date. Also on that date, the court confirmed that service had been performed in accordance with the statute on both respondent parents. CT Page 5569
On November 4, 1991, Dr. David M. Mantell, Ph.D, filed a report as a result of his evaluation. Based upon recommendations in that report, a supplemental evaluation was requested by petitioner. On January 10, 1992, the supplemental evaluation was court-ordered, and the concluding report by Dr. Mantell, Ph.D., was filed on February 18, 1992.
Respondents' counsel moved to withdraw in April of 1992. Said motion was granted and new counsel was appointed for the respondent-parents prior to trial. The trial on the termination of parental rights petition took place on May 18 and 19, 1992. CYS called Dr. David Mantell, Ph.D., the licensed clinical psychologist who performed the court ordered evaluations; Christine Leahy Keenan, pediatric physician's associate; Ann-Marie DiMauro D.M.R. Early Intervention teacher in the Birth to Three Program Carol Ferenzy, manager of occupational therapy at DAHTR; Nadine Essency, supervisor of the Children's Development and Rehabilitation Center at Danbury Hospital; Stephen Fritzer, probation officer; Paula Kennedy, licensed foster parent; and Olga Lepely, DCYS social worker.
Suzanne Knapp testified on behalf of respondent-parents, and the respondent-parents also testified.
The following Exhibits were also entered into the record:
1. Exhibit A-1 — A-2 — Evaluation of Dr. David Mantell, Ph.D.;
2. Exhibit B — Records from DAHTR;
3. Exhibit C — Picture of Jonathan Totten;
4. Exhibit D-1 — D-7 — DCYS-Treatment Plans;
5. Exhibit E — Termination of Parental Rights' Study;
6. Exhibit F — Letter to respondent-parents from Olga Lepely;
7. Exhibit G — Hospital Records re: Jonathan T., Jr.;
8. Exhibits 1-5 — Pictures of Jonathan as an infant with Respondents and during visitation;
9. Exhibit 6 — Letter to Mr. Fritzer from Joan Rolnick; and
10. Exhibit I-a through I-c — Evaluation by Dr. Ralph Welsh, Ph.D.
Background Facts: CT Page 5570
The following facts are undisputed and relevant to the adjudication.
Jonathan Totten was born on March 31, 1989, and is now three years and three months old. On July 2, 1989, Jonathan was taken by his father to the Danbury Hospital emergency room and was treated for a fractured skull. Since the explanation given at the time by the father seemed inconsistent to hospital personnel with an accidental injury, DCYS obtained an Order of Temporary Custody from this court on July 5, 1989, and the child was placed in foster care. Except for the first three months of his life, Jonathan has been with the same foster parents.
On October 10, 1989, the child was adjudicated neglected and was committed to DCYS for eighteen months, and has remained committed since that date.
ADJUDICATORY PHASE
The court will consider the facts and the evidence from July 5, 1989, when DCYS obtained the Order of Temporary Custody to August 13, 1991, the date this termination petition was filed alleging the four statutory grounds.
I. ABANDONMENT:
The first ground alleged for termination was abandonment. Section 17a-112(b)(1) of Connecticut General Statutes is met if a parent fails to maintain a "reasonable degree of interest, concern or responsibility as to the welfare of the child" and prove this ground by clear and convincing evidence. What is reasonable is a question of fact for this court to determine. In re: Luis C.,210 Conn. 157 (1989). The statutory definition differs from the common law concept of abandonment wherein an intent to abandon totally and permanently had to be established. See, e.g., Litvaitis v. Litvaitis, 162 Conn. 540, 547 (1972); Kantor v. Bloom,90 Conn. 210, 213 (1916).
The standard now requires a reasonable degree of interest as to the welfare of the child.
From the testimony of the respondent parents, Ms. Lepely, the DCYS social worker, and Ms. Knapp, a friend of the parents, the court finds the following facts as to this ground.
The respondent father was present in the delivery room at Danbury Hospital during Jonathan's birth on March 31, 1989. On July 2, 1989, the child fell to the floor and suffered a fractured skull. The father immediately drove the child to Danbury Hospital. Both respondent parents stayed with him at the hospital during the day and also stayed at night until the nurse on duty CT Page 5571 ordered them to leave.
The child was placed in foster care on July 6, 1989, and from that time to August 13, 1991 when this termination petition was filed, DCYS allowed only one supervised visit every Friday for one hour each week at the DCYS office. Ms. Lepely would drive them to the office, and testified that both parents came to visit together, and were never late and stayed the entire time. Later, they brought their twenty-month-old daughter Elizabeth with them. They never missed one visit during those two years. These parents played with Jonathan, used coloring books, and interacted properly with him. According to Ms. Lepely, the child sometimes referred to them as Mommy and Daddy. The mother requested more visits which DCYS denied, except for one supervised visit to take the child to the Danbury Mall to have his photograph taken.
Ms. Knapp testified that she has known the mother for over ten years and the father four years. She had visited them weekly after Jonathan was born. She said that both respondents were loving parents who acted appropriately towards the infant child. She is a junior at the University of Buffalo and impressed the court as an intelligent, unbiased, and credible witness.
Both parents testified that they accepted decisions made by DCYS and other authority because they did not know they had any other choice. Therefore, they agreed to the extension of commitment in 1991, and they also accepted the decision by DCYS not to increase visits. The mother testified that she has asked the foster mother what progress Jonathan was making in his therapy and about his general welfare on many occasions. Both respondent parents testified that they always wanted to regain custody of their son. The court finds these respondents have acted, for the most part, as concerned, loving parents from the time the child was born. Their conduct was shown to be much more than a reasonable degree of interest and concern for their child. Therefore, DCYS has failed to prove the first ground of abandonment.
II. FAILURE TO REHABILITATE:
The second ground was that the respondent-parents had "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child . . . [they] could assume a responsible position in the life of the child." Connecticut General Statutes, Sec. 17a-112(b)(2).
This ground requires the court to also consider the age and needs of this particular child, and whether they have reformed their behavior and life style so that they can properly parent and CT Page 5572 meet the child's needs. What is a reasonable time, and what are the needs of this child are questions of fact for the court to decide in each case. In re Rayna, 13 Conn. App. 23 (1987) and In re Luis, 210 Conn. 157 (1989). The statute requires the court to analyze the respondents' rehabilitation which must be achieved "within a reasonable time." In re Luis, supra, 167.
The respondents realize that Jonathan is a developmentally delayed child with special needs, who has been enrolled in numerous programs to correct his handicaps. They know that he must continue with occupational and speech therapy at Danbury Hospital for about two more years. The respondent parents testified that they will continue to have him receive these services to the same degree that his foster parents have done.
On October 10, 1989, the respondents agreed to an adjudication of neglect based on the child having suffered a fractured skull while in the custody of the respondent father which Danbury Hospital personnel believed was not caused by accident. The father testified that the child slipped from his hands after bathing him on July 2, which was a very warm day. He gave this same testimony to the hospital personnel and later to the Danbury police. Nevertheless, the father was arrested for risk of injury and assault and was held in pretrial detention at Bridgeport for the next ten weeks because he was unable to raise the $10,000.00 bond. Having never been in jail before, he was frightened, and his fears increased when his public defender advised him that he could receive a maximum fifteen-year jail sentence on these charges.
When the State offered him a sentence of time served and five years probation, and upon the recommendation of his attorney, he pleaded guilty under the Alford Doctrine. He began his probation on or about January 10, 1990.
Mr. Fritzer, his probation officer, testified that the respondent successfully completed a twelve-week counselling program to better control his temper on July 12, 1990. His counselor, Ms. Joan Rolnick, confirmed it by letter dated July 27, 1990, and found him to be "very conscientious in his efforts to make changes in his life." (Resp. Exh. 6) The probation officer confirmed that the respondent also received counselling from Catholic Family Services, Family and Children's Aid of Danbury and with Dr. Colen. The respondent mother attended joint counselling with him at Family and Children's Aid. Later, the Danbury Hospital Mental Health Clinic advised her that she did not need any further counselling.
The first four DCYS treatment plans dated July 20, 1989, (Exh. D-1) January 1, 1990 (Exh. D-2), July 1, 1990 (Exh. D-3) CT Page 5573 and December 28, 1990 (Exh. D-4) essentially required compliance to the following conditions and expectations: (1) attend weekly therapy sessions; (2) follow therapist recommendations; (3) continue to visit the child; (4) keep DCYS informed of their whereabouts. The goal in all these plans was reunification and "that the parents will provide a stable, safe environment for Jonathan and be able to meet his needs."
From the testimony of the probation officer, the respondents, and Ms. Lepely, the court finds that they have complied with all these expectations. Ms. Lepely also testified that the respondents are properly caring for their twenty-month-old daughter Elizabeth and that their present home is safe. The respondents testified that they recently moved into a larger apartment that has room for Jonathan, which was uncontroverted. The court finds that the respondents have complied with all four treatment plans in which the goal was to return Jonathan to them or terminate their parental rights. It is imperative that both DCYS and respondent parents be held bound to treatment plans and service agreements. The court has the duty to enforce compliance with all such agreements because they are the primary basis for reunification of a child with a parent. To do otherwise would erode the faith and trust of troubled parents in DCYS and our judicial system.
In the fifth treatment plan dated June 28, 1991, (Exh. D-5), DCYS changed the goal for the first time to termination, and Ms. Lepely testified that the reason was that the respondents failed to participate in therapy. The Court has found otherwise and at worst, they have substantially complied with that requirement. Based on all the evidence, DCYS has failed to prove this second ground of failure to rehabilitate.
III. ACTS OF COMMISSION OR OMISSION
The third ground for termination alleged by DCYS with regard to parental acts or act of commission or omission, involved three alleged acts of nonaccidental injuries. "Non-accidental or inadequately explained physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights." Sec. 17a-112 a(b)3, C.G.S.
The July 2, 1989 incident involved a serious skull fracture as previously discussed. The father testified that the child slipped from his hands after bathing him and accidentally fell to the floor. It was a warm July night, his hands were perspiring, and the baby was still wet from having given him a bath. He immediately drove the child to Danbury Hospital and repeated these facts to hospital personnel and Ms. Maxwell, the DCYS intake social worker. There was no medical testimony or other evidence to CT Page 5574 refute his explanation. Ms. Leahy-Keenan, a physician's associate, testified that X-rays taken at the hospital on July 2 revealed a healed fracture to the child's third rib. The respondents testified that their large pet cat jumped into the crib, causing it to collapse with Jonathan in it. The respondent mother immediately brought the child to the Danbury Hospital emergency room, where he was examined and discharged without X-rays being taken.
At Jonathan's physical check-up on June 16, 1989, Ms. Leahy testified that Dr. Ramathan found a large bruise on his cheek that was reported to DCYS. No action was taken against the respondent mother who testified that the bruise was caused by the child rolling over on a rattle in his crib. The testimony of the respondents was credible, consistent, and responsive. They brought him for medical check-ups regularly and immediately brought him to the hospital when they saw any signs of injury. Based on all the exhibits and reports submitted by DCYS, and the testimony at trial, the evidence was far less than clear and convincing to prove this third ground as required by statute.
IV. NO ONGOING PARENT-CHILD RELATIONSHIP
The fourth ground for termination alleged in the petition is that there is no ongoing parent-child relationship with respect to these respondents with Jonathan. Sec. 1 7a-112(b)(4). The statute defines it as "the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or the re-establishment of the parent-child relationship would be detrimental to the best interest of the child."
In determining whether there is an ongoing parent-child relationship and whether there should be termination of parental rights, the court should consider the feelings of the child toward the parents, especially if those feelings are positive rather than negative. In re: Megan M., 24 Conn. App. 338 (1991); In re: Jessica M., 215 Conn. 459.
The specific factual allegation in the Addendum to the Petition states: "Parents show little or no bonding with the child. Child has been in foster care since he was three years old, and appears to have visible emotional ties with his foster mother, whom he recognizes as his only parent figure."
The respondents never missed a visit with Jonathan since he was committed to foster care almost three years ago. They testified that they love Jonathan and believe that there is a bond between them. They shared parenting duties for Jonathan before he was taken from their custody. When the respondent mother CT Page 5575 was asked whether there was a bond between her and Jonathan she answered: "From the way he looks at me, I do." The respondent father testified that Jonathan recognizes him when they meet at visits, that he loves his son, and that he also believed that there was a bond between Jonathan and both he and his wife.
The court finds from their testimony and acts that there are positive feelings between them and their child and further time to allow it to develop would be in the child's best interests.
Dr. Mantell's reports dated November 4, 1991 and February 18, 1992, primarily address issues the court can consider only after the adjudicatory phase of this trial. He claims that the child is more attached to his foster mother. This is hardly surprising since this child has spent all but three months of his life with these foster parents. Even though this issue cannot be addressed at this phase, his reports on February 9, 1992 concluded: "With exposure and encouragement, Jonathan shows an increasing capacity to relate to all biological members of his family. Given the special characteristics of the child, the intense and supportive care he has received in the foster home, and the protective stance the foster mother takes with him, it is not surprising that the child has retained a primary, psychological bond with the foster mother and a reluctance especially in her presence to interact with other adults. The foster mother has not been observed to strongly encourage interaction. . . ."
He further concludes "I would like to see how all of the adults and the child react to an increased visitation schedule" It is undisputed that DCYS never allowed an increased visitation schedule to be implemented.
Dr. Mantell's final recommendation is "If it is legally possible, I would suggest not withdrawing the Termination Petition while allowing the above recommendations three to six months to prove themselves."
Based on this report, and all the testimony presented, the court finds that DCYS has failed to prove this fourth ground.
For the foregoing reasons, this petition to terminate the respondents' parental rights is dismissed.
The Court orders that DCYS file with the Court within thirty days an increased visitation schedule for supervised, unsupervised, and overnight visitation, and provide any other services that will expedite reunification of this child with the respondents. (See Sections 17-38(a) and 17-43(d) of the Conn. General Statutes). CT Page 5576